| | |
|---|---|
| DISTRICT COURT, JEFFERSON COUNTY, STATE OF COLORADO<br>Jefferson County Court & Administrative Facility<br>100 Jefferson County Parkway<br>Golden, CO 80401<br>(720) 772-2500 | DATE FILED: April 26, 2022 12:53 PM<br>FILING ID: C27AE2D4C78AB<br>CASE NUMBER: 2022CV30474 |
| DANIEL A. DRENNAN, M.D., an individual and COMPREHENSIVE PAIN SPECIALISTS, INC., a Colorado corporation.<br><br>Plaintiffs,<br>v.<br><br>DILLON COMPANIES, LLC, a Kansas limited liability company d/b/a KING SOOPERS, INC. and THE KROGER CO.<br><br>Defendants. | **COURT USE ONLY** |
| *Attorneys for Plaintiffs*<br><br>Douglas T. Logsdon, No. 21947<br>MCBRAYER PLLC<br>201 East Main Street, Suite 900<br>Lexington, Kentucky 40507<br>T: (859) 231-8780<br>dlogsdon@mcbrayerfirm.com<br><br>David J. Driscoll, No. 12246<br>Jonathon B. Boonin, No. 23113<br>HUTCHINSON BLACK AND COOK, LLC<br>921 Walnut Street, Suite 200<br>Boulder, CO 80302<br>T: 303-442-6514<br>F: 303-442-6593<br>driscoll@hbcboulder.com<br>boonin@hbcboulder.com | Case Number:<br><br>Courtroom:      Division: |
| **COMPLAINT AND JURY DEMAND** ||

NOW COME the Plaintiffs, Daniel A. Drennan, M.D. ("**Dr. Drennan**") and Comprehensive Pain Specialists, Inc. ("**CPS**"), by counsel, and for their Complaint against Defendants, Dillon Companies, LLC d/b/a King Soopers, Inc. ("**King Soopers**") and The Kroger Co. ("**Kroger**"), state and allege as follows:

## I: PARTIES

1.      At all times relevant herein, Dr. Drennan is and has been a resident of and domiciled within Jefferson County, Colorado whose principal place of business is located at 400 Indiana Street, Suite 320, Golden, CO 80401.

2.      At all times relevant herein, CPS is and has been a Colorado corporation, authorized to transact business and provide medical and related services within the State of Colorado, whose principal place of business is located at 400 Indiana Street, Suite 320, Golden, CO 80401.

3.      At all times relevant herein, Dillon Companies, LLC, is and has been a Kansas limited liability company whose principal place of business is located at 2700 East 4th Street, Hutchinson, KS 67501-1903; and King Soopers is and has been a trade name of Dillon Companies, LLC. The registered agent for service of process of Dillon Companies, LLC is Corporation Service Company, 1900 W. Littleton Boulevard, Littleton, CO 80120. King Soopers has stores and pharmacies throughout Colorado, including Jefferson County, and upon information and belief, maintains a King Soopers divisional office at 65 Tejon Street, P.O. Box 5567, Denver, CO 80217.

4.      At all times relevant herein, upon information and belief, Dillon Companies, LLC is and has been a wholly owned subsidiary of The Kroger Co., an Ohio corporation whose principal place of business is located at 1014 Vine Street, Cincinnati, OH 45202. The registered agent for service of process of The Kroger Co. is Corporation Service Company, 1900 W. Littleton Boulevard, Littleton, CO 80120. The Kroger Co. has numerous subsidiaries and affiliates,

including but not limited to entities that appear to be concerned with the pharmacy business, some of which are authorized to do business in Colorado.  This Complaint asserts claims against the party or parties that have directed and implemented the acts and omissions of King Soopers pharmacies in Colorado with regard to Plaintiffs as described herein, which upon information and belief include The Kroger Co.  All subsidiaries and affiliates of the Defendants named herein that have directed and implemented the acts and omissions of King Soopers pharmacies alleged herein are hereby notified that Plaintiffs reserve the right to amend this Complaint to state the proper party's identity upon discovery of same.

## II: VENUE

5.     Venue is proper in this Court pursuant to, without limitation, C.R.C.P. 98(c)(5) because tortious conduct that has given rise to this Complaint occurred in this county.

## III: RELEVANT FACTS

6.     Dr. Drennan is licensed to practice medicine in Colorado by the Colorado Medical Board.  Dr. Drennan and is certified in both Anesthesiology and Pain Management by the American Board of Anesthesiology and obtained fellowship training in chronic pain management at the University of Utah in 2007-2008.

7.     Dr. Drennan has published numerous articles, made many professional presentations, and served in multiple academic posts as a pain management physician. Currently, Dr. Drennan is an Assistant Professor at Rocky Vista University and teaches the "Colorado Guidelines for the Safe Prescribing of Opioids" to medical students and residents. Among other service, Dr. Drennan was previously an advisor to the Utah Medical Association's Controlled Substances Task Force and currently serves as a consultant for the Colorado Department of Regulatory Agencies regarding safe prescribing practices.

8.      In 2011, Dr. Drennan established CPS, which provides pain management treatment of patients, and which treats chronic pain symptoms through multiple therapies, interventional treatments, and medication management. Dr. Drennan is and has been the sole owner of CPS at all pertinent times.  CPS holds all appropriate regulatory registrations and authorizations with state and federal authorities to operate as a pain management medicine clinic.

9.      CPS is a referral destination for numerous patients residing in the greater Denver area, with many referrals of patients coming from primary care providers as well as from orthopedic physicians, orthopedic surgeons, and neurosurgeons.

10.     As a pain management specialty practice, patients are generally accepted at CPS and by Dr. Drennan upon referral from other health care providers because those other providers are seeking to refer to practitioners with the necessary training and experience in working with patients coping with long term managed pain. Dr. Drennan's patients are often long-term patients who present with multiple co-morbidities and complex medical issues.

11.     Dr. Drennan and CPS practice pain management medicine in full compliance with the Colorado Department of Regulatory Agencies' Guidelines for the Safe Prescribing and Dispensing of Opioids ("DORA Guidelines") and Colorado Prescription Drug Monitoring Program ("PDMP"). When a patient presents to CPS as a new patient, patient information and history along with diagnostic studies  are collected from the referring provider(s) along with review of the patient's PDMP profile or other controlled substance prescription monitoring system.  The patient completes forms to provide past medical/surgical history. The patient undergoes a physical examination by Dr. Drennan or another provider, who obtains a full history and performs a focused physical examination. Additional diagnostic studies or other tests may be ordered. Using this information, a treatment plan is formulated that may include surgical interventions, rehabilitative

therapies including physical and occupational therapy, laboratory testing, spinal joint injections or aspirations, therapeutic devices such as stimulators, referrals for psychiatric or other behavioral health treatment, and medication management.

12.     When devising and formulating a treatment plan for a patient, any decision to prescribe controlled substances as part of the treatment plan is based on many different factors that may include the following: information from the referring physician, diagnostic studies and testing, PDMP reports, previously prescribed medications including controlled substances, patient history, age, allergies, co-morbidities, and the patient's functional history. Dr. Drennan and the providers at CPS utilize the DORA Guidelines to assess patients and formulate treatment.

13.     After meeting with the prospective patient, Dr. Drennan makes a preliminary decision to either continue controlled substances therapy as part of a treatment plan or take some other step with the goal of getting the patient off of medication. The patient is educated and counselled about the risks and benefits of controlled substances, CPS's policies, expectations and monitoring, the patient's opioid risks are determined, and informed consent is obtained from the patient. CPS has established a rigorous compliance policy where each individual patient's compliance is closely monitored by CPS staff and treating providers. CPS implements review of patient PDMP reports to detect whether patients engage in "doctor shopping," whether the patient is taking the medication as prescribed, and whether diversion is apparent, among other things. Patients meet with CPS staff for medication reviews and urine drug screen testing is performed to assure compliance. CPS staff often pull follow-up PDMP reports.

14.     CPS's patients are educated by CPS staff about medication therapy with controlled substances, are asked to give informed consent to treatment, are required to execute controlled substances agreements, and are given policies about urine drug screening and the expectations of

compliance with CPS policies and procedures. "Doctor shopping" is explained to the patients and the importance of maintaining strict compliance and security for medications on an individual level is explained to the patient.

15.     If a patient has failed one of CPS's routine compliance surveillance tools, then a decision is made regarding appropriate measures for that individual patient. These follow up measures include counselling, treatment with other medications, and releasing/discharging the patient from the practice and referral to appropriate providers for care, counseling, or treatment.

16.     CPS has implemented processes to assure compliance and responsible prescribing practices. Staff have ongoing training on identifying potential issues and best practices for the management of chronic pain patients.

17.     To the best of his recollection, during his years of pain management practice, Dr. Drennan has never initiated a patient on opioid medication.  He has, however, worked with thousands of patients to detox from opioid treatment and safely step down from and exit a regimen of opioid medications.  Dr. Drennan's operation of CPS and prescribing of controlled substances to patients with chronic pain conditions are in strict compliance with the standards of applicable state and federal statutory and regulatory requirements for the prescribing of controlled substances and the operation of a pain management facility.

18.     Dr. Drennan has never, to his knowledge, been investigated for illegal or improper prescribing practices by the federal Drug Enforcement Agency, the State of Colorado, or any similar agency. His Colorado license and authorization to prescribe medications have never been subject to suspension or disciplinary action of any kind.  Dr. Drennan was previously licensed to practice medicine in California and Utah; he allowed those licenses to lapse simply because he no longer lived or practiced in those states.  Dr. Drennan's California and Utah licenses and

authorizations to prescribe medications have never been subject to suspension or disciplinary action of any kind.  To the contrary, Dr. Drennan teaches and practices responsible prescribing protocols. He has served as a resource for the development of regulatory practices on multiple occasions, dating back to 2009 while working with the Utah Controlled Substances Task Force and DEA.

19.     Dr. Drennan received a letter dated December 20, 2012 from The Kroger Co. Law Department.  The letter identified Kroger as the "parent company" of King Soopers.  The letter stated, in part, that The Kroger Company and King Soopers "will no longer be able to fill controlled substance prescriptions prescribed by [Dr. Drennan]."  The letter referenced a DEA investigation that was completely unrelated to any conduct of Dr. Drennan:

> Last winter the Drug Enforcement Administration ("DEA") investigated and took action against Cardinal Health and 4 retail pharmacies in Florida. The DEA asserted that the distribution center was distributing and the retail pharmacies were dispensing excessive amounts of controlled substances, including oxycodone containing products. At the conclusion of that investigation, the DEA suspended Cardinal Health's Florida distribution center's DEA registration. In addition, the individual pharmacies either voluntarily surrendered or the DEA revoked each of their DEA registrations. As a result of the DEA's recent activity, it is prudent that we take proactive steps to prevent similar issues at our pharmacies. . . .  At this time we must unfortunately let you know that we intend to cease filling controlled substance prescriptions prescribed by you immediately.

20.     The 2012 letter failed to establish, or even allege, any irregular, improper, or illegal conduct whatsoever by Dr. Drennan.[1] The letter failed to provide any specific reason for King Soopers' decision to cease filling his prescriptions.  It merely stated that "we may review prescriptions and quantities of controlled substances purchased and dispensed at particular

---

[1] Upon information and belief, King Soopers paid approximately $7 million in 2005 to settle claims for deficient procedures in its pharmacies' tracking and securing of controlled substances alleged by the U.S. Attorney.  That settlement had no relationship to any acts or omissions of Dr. Drennan.

pharmacies as well as the prescribing practices of certain practitioners.  To the extent we identify quantities, doses and/or other prescribing practices that raise concerns, we may take various actions including not filling controlled substance prescriptions written by certain practitioners."  Dr. Drennan was never provided with any specifics about, nor any opportunity to challenge or rebut, any "prescribing practices that raise concerns."  Nevertheless, King Soopers pharmacies ceased filling prescriptions for controlled substances written by Dr. Drennan.

21.    In or around February 2013, counsel for Dr. Drennan wrote to Kroger's General Counsel, advising that King Soopers pharmacies were engaged in defamation of Dr. Drennan. Specifically, King Soopers pharmacy personnel had made statements indicating that Dr. Drennan was under investigation by the DEA for illegal conduct and then refused to fill any prescriptions based on that false representation, and Dr. Drennan received phone calls from other physicians referring patients to him, with similar reports of slanderous representations being made to those patients. Certain physicians indicated that they would stop making referrals. Dr. Drennan's counsel advised that he was and continued to be in good standing with the DEA related to his authorization to prescribe controlled substances. Dr. Drennan's counsel requested a clear explanation of the company policies behind King Soopers' refusal to fill Dr. Drennan's controlled substances prescriptions and unequivocally demanded that action be taken immediately to have pharmacy personnel cease and desist from publishing slanderous statements about Dr. Drennan.  Neither counsel nor Dr. Drennan received a written response to the 2013 letter.  Instead, after being placed on notice that its conduct was incorrect and improper, King Soopers continued to decline prescriptions for controlled substances from Dr. Drennan; and its personnel continued to provide inaccurate and defamatory explanations to his patients for such refusal.

22.    In addition to formal written communications, Dr. Drennan's business manager and others telephoned King Soopers pharmacies on multiple occasions, seeking resolution of this situation or at least a clear explanation of the policies and criteria upon which King Soopers based its decision-making and conduct.  No clear explanation was ever given.

23.    CPS brought on an additional physician and multiple physicians' assistants beginning in approximately 2013, largely to deal with the situation presented by King Soopers. By engaging in this costly effort to mitigate the effects of King Soopers' unsupported conduct, for several years, Dr. Drennan's individual practice was less directly affected by King Soopers' refusal; but even then, his reputation continued to be damaged.  Dr. Drennan practiced with other physician partners and physicians' assistants whose controlled substances prescriptions were honored by King Soopers and who could, when necessary, provide care for patients who relied on King Soopers' pharmacies.  At its largest, the practice included as many as seven physicians and four physicians' assistants.

24.    Over several years, Dr. Drennan's volume of controlled substances prescriptions appreciably declined, to the point that he personally wrote few such prescriptions in recent years. For example, to the best of his knowledge, Dr. Drennan wrote only one to two controlled substances prescriptions in each of 2020 and 2021.  More recently, however, multiple providers left employment with CPS.  The practice decreased in size and the number of available personnel likewise decreased.  As of the date of this Complaint, CPS includes one physician (in addition to Dr. Drennan) and one physicians' assistant.

25.    Since approximately October 2021, Dr. Drennan has, of necessity, resumed more active involvement in direct patient care duties, which means that he has returned to more actively prescribing controlled substances medications.  Because of staff turnover, CPS can no longer

depend on others to address the needs of King Soopers patients.  When he resumed additional clinical duties, Dr. Drennan and his patients were again confronted on numerous occasions by continued wrongful conduct and statements of King Soopers pharmacies, and Dr. Drennan was again confronted with the negative financial and professional impacts caused by that conduct.

26.     Dr. Drennan's patients with controlled substances prescriptions have continued to be turned away by King Soopers pharmacies.  Based on contemporaneous notes, reported explanations since approximately October 2021 have included that "corporate has red flagged Dr. Drennan;" "computer says not allowed to fill controlled substances for this provider;" "Dr. Drennan's DEA expired;" and, "King Sooper called stating that Dr. Drennan's DEA has been discarded therefore they would not be able to fill the medications."  Anecdotally, remarks by King Soopers pharmacy personnel have included statements that he must have done something wrong and/or indicating that Dr. Drennan was under investigation for improper or illegal conduct.

27.     The effect of King Soopers' refusal to fill controlled substances prescriptions is amplified by the fact that for certain health insurance plans in Colorado, King Soopers is the primary or sole approved or in-network pharmacy provider.  Upon information and belief, certain plans require the exclusive use of King Soopers pharmacies, or provide significantly reduced benefits if the patient uses another pharmacy.  Upon information and belief, this type of exclusivity affects a significant percentage of Dr. Drennan's insured patient population.  Moreover, even for patients for whom King Soopers is not the primary or sole approved or in-network pharmacy provider, King Soopers is often one of the least expensive pharmacy options available for many medications; therefore, patients are likely to incur increased costs if some of their physician's prescriptions will not be honored by King Soopers.  CPS' records indicate that currently, over 450 of its patients list a King Soopers pharmacy as their default pharmacy.

28.     King Soopers and The Kroger Co. have not provided specific grounds or reasons for instructing their pharmacists in Colorado to stop filling controlled substances prescriptions that Dr. Drennan has written.  No individual pharmacist has provided specific grounds for not filling Dr. Drennan's controlled substances prescriptions.  Counsel for Dr. Drennan wrote again to Kroger's General Counsel in March 2022, demanding, among other things, an explanation for why King Soopers continued to refuse to fill Dr. Drennan's controlled substances prescriptions, particularly given the marked decrease in the volume of such prescriptions he has written in recent years.  No response has been received.

29.     The controlled substances prescriptions that Dr. Drennan has written for patients are supported by medical necessity and fully adhere to all applicable state and federal legal guidelines and regulations regarding the prescribing of controlled substances, and King Soopers has produced nothing to suggest otherwise.

30.     At no time has King Soopers, or any individual pharmacist employed by or affiliated with King Soopers in Colorado identified any reason or evidence that any of Dr. Drennan's prescriptions for controlled substances are for anything other than legitimate medical purposes. At no time has King Soopers, or any pharmacist with King Soopers, provided any evidence of a lack of medical necessity for any such prescription, or otherwise established that any such prescription failed to comply with applicable federal and state legal guidelines and clinical guidelines for prescribing controlled substances.

31.     King Soopers' instructing its local pharmacists in Colorado to stop filling Dr. Drennan's controlled substances prescriptions has necessarily implied, and will continue to imply, to patients and their referring medical providers that the prescriptions that CPS and/or Dr. Drennan have written are illegitimate, improper, illegal or otherwise not in keeping with standards of care,

to the damage of Dr. Drennan's and CPS's professional reputation and standing in the Colorado medical community.

32.    The foreseeable result of pain management patients who are limited to one pharmacy (or whose financial situation limits them to one pharmacy option) that will not honor the prescriptions of their physician is to terminate their care with that physician; however, that is not a simple matter.  Defendant King Soopers' refusal to fill prescriptions Dr. Drennan has written for chronic pain patients will foreseeably result in patients leaving the care of CPS and/or Dr. Drennan to seek care from other physicians to manage their chronic pain and medications. Because of the limited number of physicians practicing in the pain management specialty, patients are likely to have difficulty finding another pain treatment facility licensed with the State of Colorado.

33.    King Soopers' actions create a choice for the patients of Dr. Drennan and CPS: whether the patient should continue under the care of a physician the patient has known for years and attempt to find a satisfactory alternative to King Soopers, or keep King Soopers and try to find a satisfactory alternative to their long-time physician. King Soopers' actions unfairly, improperly and needlessly create a dilemma for these patients.  Because of "doctor shopping" and "pharmacy shopping" concerns by other physicians and pharmacies, the foreseeable result is that real patients with very serious medical issues are likely to be denied treatment based on King Soopers' corporate medical decisions, resulting in a range of dangerous and detrimental effects.  In one real-world example, one of Dr. Drennan's patients suffered unrelieved pain throughout the extended Thanksgiving weekend in the fall of 2021 because King Soopers refused to fill Dr. Drennan's prescription for medically necessary pain medication.

34.    Defendants performed no investigation, and/or performed an insufficient, defective, deficient, negligent, reckless, and unreasonable investigation, and announced without

warning that the ability of Dr. Drennan's patients to have controlled substances prescriptions filled by one of the largest pharmacies in the region (if not the largest) was abruptly terminated. Despite communications on behalf of Dr. Drennan, at no time since 2012 have the Defendants re-visited their unsupported decision to refuse to fill Dr. Drennan's controlled substances prescriptions.

35.     The relationship between physician and patient is vital, but so too is that between a pharmacist and patient. It is even more important when a patient is taking opioid pain medication. Termination of that relationship places a harsh stigma on pain patients who may be labeled as "pharmacy shoppers" for switching pharmacies. Significant stigma may be attached to CPS patients who must switch pharmacies as a result of King Soopers' actions, which foreseeably force a vulnerable population of legitimate pain management patients to suffer unnecessarily.

36.     King Soopers' bar on Dr. Drennan's prescribing effectively communicated to dozens of pharmacists in its employ that Dr. Drennan and CPS issued prescriptions without a legitimate medical purpose in violation of 21 C.F.R. § 1306.04, based on no investigation, and/or on an insufficient, defective, deficient, negligent, reckless, and unreasonable investigation, which has not been re-visited in the intervening decade, despite notice to Defendants of their error, and significantly changed circumstances.

37.     King Soopers knows or should know that its allegations against Dr. Drennan are false because it has not engaged in a sufficient investigation to confirm whether controlled substances prescriptions submitted to King Soopers pharmacies were issued for a "legitimate medical purpose and in the course of professional practice." 21 C.F.R. § 1306.04. King Soopers' corporate decision to prohibit its pharmacists from filling controlled substances prescriptions issued by Dr. Drennan usurps their pharmacists' independent professional judgment and constitutes the improper and unlicensed practice of pharmacy.

## COUNT 1
## TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

38.     Plaintiffs incorporate by reference all previous averments set out herein and further plead as follows.

39.     According to the American Medical Association ("AMA") Code of Ethics, an implied contract exists between patients and their physicians, which gives rise to physicians' ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others, and to use sound medical judgment on patients' behalf, and to advocate for their patients' welfare.

40.     Defendants, operators of a large national pharmacy chain, have knowledge of the sanctity of the relationship, including but not limited to the implied contractual relationship, between a physician and patient and a pharmacist and patient.

41.     Defendants intentionally and improperly interfered with the business relationships between Dr. Drennan and CPS and their patients by instructing their pharmacists to abandon their professional duty and independent judgment as pharmacists and refuse to fill Dr. Drennan's controlled substances prescriptions.

42.     Defendants intentionally and improperly interfered with Dr. Drennan's patients' ability to receive adequate treatment when they informed pharmacies under their control to abdicate their duty to individually assess each controlled substances prescription issued by Dr. Drennan to a patient who was a King Soopers pharmacy customer.

43.     Defendants intentionally and improperly interfered with the relationship between Dr. Drennan and CPS and their patients who went to fill prescriptions at King Soopers and caused

a breach of that relationship by refusing valid prescriptions for legitimate medications.  Moreover, Defendants engaged in the unlicensed practice of pharmacy by making a corporate decision to instruct licensed pharmacists to refuse to fill prescriptions without determining medical necessity.

44.     Defendants took these actions without conducting an investigation and/or without conduction a proper investigation. In taking these actions, Defendants likely breached their own policies, and engaged in the unauthorized practice of pharmacy by usurping the professional judgment of their pharmacists.

45.     As a direct and proximate result of Defendants' intentional and improper interference with business relationships, Plaintiffs Dr. Drennan and CPS have sustained economic and reputational damages, including but not limited to the uncompensated costs associated with employing additional professional staff, and will sustain such damages in the future, in an amount in excess of the jurisdictional limit of this Court.

**COUNT 2**
**DEFAMATION**

46.     Plaintiffs incorporate by reference all previous averments set out herein, and further plead as follows.

47.     Without limitation, Defendants expressly and/or impliedly published false and defamatory statements and/or otherwise conveyed false and defamatory representations to Plaintiffs' patients that Dr. Drennan has improperly prescribed controlled substances medications, is not authorized to prescribe controlled substances, has been singled out for non-fulfillment of controlled substances prescriptions, and/or otherwise has  engaged in illegal, unprofessional, and/or improper acts, by, without limitation, Defendants' refusal to honor Dr. Drennan's controlled substances prescriptions, and by derogatory, unfounded, and false statements of Defendants' pharmacists, including but not limited to those statements expressly described in this Complaint.

48.     These actions and statements directly and detrimentally impacted and continue to impact Plaintiffs' reputations with their patients, prospective patients, referring physicians, other pharmacies, and the Department of Justice and Colorado Medical Board.

49.     Defendants published these statements and took these actions regarding Plaintiffs Dr. Drennan and CPS negligently, and/or with knowledge of their falsity, and/or in reckless disregard of the truth, which is that Plaintiffs have not engaged in illegal, unprofessional, or improper acts, are not subject of any disciplinary actions or findings by federal or state regulatory authorities, are duly authorized to prescribe controlled substances, and prescribe controlled substances for legitimate medical purposes.

50.     As a direct and proximate result of Defendants' false and defamatory statements and conduct, Plaintiffs Dr. Drennan and CPS have sustained economic and reputational damages, including but not limited to the uncompensated costs associated with employing additional professional staff, and will sustain such damages in the future, in an amount in excess of the jurisdictional limit of this Court.

## COUNT 3
## NEGLIGENCE

51.     Plaintiffs incorporate by reference all previous averments set out herein and further plead as follows.

52.     Defendants had a duty toward Dr. Drennan, CPS, and Dr. Drennan's and CPS's patients to use reasonable care to determine whether to continue to fill Dr. Drennan's controlled substances prescriptions, including but not limited to a duty to perform a reasonable investigation to determine whether Dr. Drennan's controlled substances prescriptions filled by King Soopers pharmacies were issued for a legitimate medical purpose and in the course of professional practice.

Defendants had a continuing duty to use reasonable care to make such determinations over the past decade, and continue to have such a duty currently.

53.     Defendants breached, and continue to breach, their duty to use reasonable care as described in the foregoing paragraph by, without limitation, failing to engage in a reasonable investigation to determine the legitimacy of Dr. Drennan's controlled substances prescriptions and failing to re-visit their arbitrary and capricious decision over approximately a decade.

54.     As a direct and proximate result of Defendants' negligence, Plaintiffs Dr. Drennan and CPS have sustained economic and reputational damages, including but not limited to the uncompensated costs associated with employing additional professional staff, and will sustain such damages in the future, in an amount in excess of the jurisdictional limit of this Court; and Dr. Drennan's and CPS's patients have sustained harmful, arbitrary, and capricious interruption and impairment of their legitimate medical treatment, to their detriment.

**COUNT 4**
**INJUNCTIVE RELIEF**

55.     Plaintiffs incorporate by reference all previous averments set out herein and further plead as follows.

56.      King Soopers is one of the Colorado region's largest pharmacy chains and its decisions carry weight in the pharmacy community.  King Soopers' arbitrary and capricious decision for blanket refusal of Dr. Drennan's controlled substances prescriptions has caused and will continue to cause Dr. Drennan and CPS severe economic and reputational harm, and has caused and will continue to cause to loss of business and inadequate treatment of their patients.

57.     As a result of Defendants' unsupported, arbitrary, and capricious action, if CPS patients attempt to go to another pharmacy, they are at high risk of being labeled as "doctor shoppers" or "pharmacy shoppers" and treated with suspicion. The DEA in its administrative

proceedings is known to take aggressive action against pharmacies that fill prescriptions for patients who use multiple pharmacies or prescriptions from physicians whose activities raise red flags. *See, In Re Holiday CVS, LLC,* 77 Fed. Reg. 198., p. 62315-62346 (2012) (revoking registration of pharmacy that dispensed controlled substances pursuant to prescriptions that raised red flags that pharmacists could not resolve).

58.     Stigma associated with pain patients and pain management provers is a real concern. In 2019 the United States Department of Health and Human Services (HHS) issued a report, Pain Management Best Practices—Inter-Agency Task Force Report, which in part addressed the stigma that pain management patients face. The report noted that "Reducing barriers to care that exist as a consequence of stigmatization is crucial for patient engagement and treatment effectiveness."  Among HHS's recommendations was to "reduce stigma in opioid use so that it is never a barrier to patients receiving appropriate treatment."  King Soopers' decision to treat Dr. Drennan as an illegitimate provider, and to turn his patients away at their pharmacy counters, is directly contrary to HHS's recommendation to reduce stigmatization.

59.     Dr. Drennan, CPS, and their patients will bear stigma as a result of King Soopers' decisions.  Real patients with very serious medical issues will likely be denied treatment if King Soopers is permitted to continue to make corporate medical decisions that impact a large number of Colorado residents suffering from legitimate pain.  There is not an adequate remedy at law for the prior, current, and ongoing detriment to these patients and to Dr. Drennan's and CPS's professional reputations.

60.     CPS and Dr. Drennan have a high likelihood of success on the merits of this action. King Soopers performed no investigation, and/or performed an insufficient, defective, deficient, negligent, reckless, and unreasonable investigation.  King Soopers arbitrarily and capriciously

made a corporate decision that impacted the health of over 450 of CPS's patients and likely many others, and continues to refuse to correct its course.

61.     Dr. Drennan and his patients and CPS will suffer irreparable injury if this Court does not act. The denial and/or deferral of necessary medical care, and more specifically pain treatment for debilitating and severe medical conditions, will cause irreparable injury. Patients whose physician-patient relationship is abruptly severed by King Soopers will face the prospect of debilitating pain. Limitations on the number of available providers will foreseeably cause patients to go without treatment causing further injury and exacerbation of their medical conditions, or to seek other avenues for pain treatment or self-treatment, with foreseeable serious risks.  Each of the patients at CPS have varying degrees of medical issues, ranging from severe to moderate. The commonality that most, if not all, share is that they have been referred to CPS for treatment by a qualified primary care physician who has determined that they require pain management treatment. King Soopers seeks to deny that treatment based on its arbitrary decision, casting each patient into the range of dangerous and detrimental effects that comes with denial of legitimate medical care.

62.     Dr. Drennan and CPS will suffer irreparable injury to their professional reputations and the ability of the practice to continue to operate after being effectively sanctioned by one of the nation's largest pharmacy chains. King Soopers' actions are unsupported by facts, but have impacted and continue to impact Dr. Drennan's reputation and the viability of CPS.

63.     Dr. Drennan and CPS are entitled to injunctive relief, to enjoin Defendants from refusing to fill CPS' and Dr. Drennan's controlled substances prescriptions and to enjoin Defendants from expressly or impliedly publishing false and defamatory statements regarding Dr. Drennan, including but not limited to the types of express and implied statements described herein.

WHEREFORE, Plaintiffs respectfully demand:

1.      That summons be issued to Defendants Dillon Companies, LLC d/b/a King Soopers and The Kroger Co.

2.      That this Court issue injunctive relief, enjoining Defendants from refusing to fill CPS' and Dr. Drennan's controlled substances prescriptions and enjoining Defendants from expressly or impliedly publishing false and/or defamatory statements regarding Dr. Drennan, including but not limited to the types of express and implied statements described herein.

3.      That this Court award Plaintiffs damages sufficient to compensate them for their economic and reputational damages directly and proximately caused by the Defendants' tortious interference with business relationships; knowing, reckless, and negligent false and defamatory representations, statements, and conduct; and negligent failure to use reasonable care in decision-making, all as described herein, in amounts in excess of the jurisdictional limit of this Court.

4.      That this Court award Plaintiffs prejudgment and post-judgment interest on all amounts awarded as allowed by law.

5.      That this Court award Plaintiffs their costs expended herein including their reasonable attorneys' fees.

6.      Trial by jury.

7.      That this Court award any and all other relief to which Plaintiffs may be entitled.

Dated April 26, 2022.

Respectfully submitted,

/s/ *Douglas T. Logsdon*
Douglas T. Logsdon, No. 21947
MCBRAYER PLLC
201 East Main Street, Suite 900
Lexington, Kentucky 40507
(859) 231-8780
Email: dlogsdon@mcbrayerfirm.com

and

David J. Driscoll, No. 12246
Jonathon B. Boonin, No. 23113
HUTCHINSON BLACK and COOK, LLC
921 Walnut Street, Suite 200
Boulder, CO 80302
(303) 442-6514
Email: driscoll@hbcboulder.com
      boonin@hbcboulder.com
*Counsel for Plaintiffs Daniel A. Drennan, M.D. and Comprehensive Pain Specialists, Inc.*